O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL COAST PIPE LINING, INC., | Case No. 2:13-cv-639-ODW(Ex) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [17]** |
| v. | |
| PIPE SHIELD USA, INC.; PIPE SHIELD SERVICES, LTD.; B.G. ARNOLD SERVICES T/A BRADLEY MECHANICAL SERVICES; ELASTOCHEM COMPANY SPECIALTY, INC.; DOES 1–100, inclusive, | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Central Coast Pipe Lining, Inc., BG Arnold Services T/A Bradley Mechanical Services ("BMS"), Pipe Shield USA, Inc., and Pipe Shield Services, Ltd. entered into a Settlement Agreement on January 18, 2012, severing their business relationship. Central Coast then attempted to purchase epoxy necessary for its business from Elastochem, the manufacturer of the epoxy formerly sold to Central Coast by Pipe Shield USA. Since Elastochem does not sell directly to consumers, it declined to sell epoxy to Central Coast except for Plaintiff's personal use. Armed with this refusal, Central Coast alleges that Defendants breached the Settlement Agreement and conspired with each other to cut off Plaintiff's epoxy access. After

considering Central Coast's seven claims, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.[1]

## II. FACTUAL BACKGROUND

Central Coast is a California corporation with its principal place of business in San Luis Obispo County, California. (First Amended Complaint ("FAC") ¶ 2.) Central Coast engages in the "blow through epoxy lining" business and sells supply agreements for implementation of epoxy-lining products. (*Id.* ¶ 5.)

Pipe Shield USA is incorporated and has its principal place of business in Connecticut. (*Id.* ¶ 3.) Pipe Shield Services and BMS are Canadian companies. (*Id.*)

Between January 1, 2010, and January 18, 2012, Pipe Shield USA, Pipe Shield Services, and BMS (collectively, the "Pipe Shield Defendants"[2]) were Central Coast's sole suppliers of AN 500, a specialized type of epoxy. (*Id.* ¶ 6.) But on January 18, 2012, Central Coast and the Pipe Shield Defendants entered into a Settlement Agreement. (*Id.* ¶ 8, Ex. 1.) Under this agreement, Pipe Shield USA and Central Coast agreed to terminate Plaintiff's licensing agreement, which had previously given Central Coast certain rights to Pipe Shield's products in California. (*Id.* Ex. 1.) Pipe Shield USA agreed in exchange to refund $70,000 of the $100,000 licensing fee Central Coast had previously paid. (*Id.*)

Under paragraph 4 of the Settlement Agreement, all parties also agreed "that each [would] for itself and/or directly or indirectly through any other party, refrain from interfering with, hindering or by any means impeding the business operations and/or expansion of any other Party." (*Id.*) But the parties were allowed to compete with each other in a "commercially reasonable manner." (*Id.*)

Elastochem manufactures the AN 500 epoxy and the allegedly identical AG 310 epoxy, which Central Coast attempted to purchase directly from Elastochem instead of

---

[1] After carefully considering the papers filed with respect to this Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

[2] Central Coast refers to all three of these entities as "Pipe Shield Defendants," so the Court does too.

through Pipe Shield USA. (*Id.* ¶ 11(a).[3]) Central Coast's President Stan Rutiz emailed Elastochem three times, inquiring whether he could purchase the AG 310 epoxy directly from Elastochem. On February 29, 2012, Elastochem ultimately declined, informing Rutiz that he had to purchase the epoxy through BMS. (*Id.* Ex. 3.) But Elastochem did offer to sell the epoxy to Central Coast for its personal, rather than commercial, use. (*Id.* ¶ 11(a)(i), (b).)

Despite Elastochem's response, Central Coast alleges that Elastochem offered AG 310 for sale on the Internet to the general public for $135 a gallon and that Central Coast was the only prospective purchaser denied the ability to purchase AG 310. (*Id.* ¶ 11(a)(ii)–(iv).) Central Coast argues that it was unable to obtain the epoxy because Defendants conspired to obstruct its access to AG 310. (*Id.* ¶ 11(a).) Plaintiff contends that it lost some $250,000 per year in anticipated profits due to this alleged conspiracy. (*Id.* ¶ 11-2.) Central Coast maintains that it could have sold at least 1,500 gallons of AG 310 per year at over $300 per gallon. (*Id.*)

On December 17, 2012, Central Coast filed a Complaint against Defendants in California state court. BMS and Elastochem then removed the action to this Court. On February 5, 2013, Defendants filed their first motion to dismiss. (ECF No. 11.) Central Coast failed to oppose the motion, so the Court granted it. (ECF No. 12.) After Central Coast filed its seven-claim First Amended Complaint, Defendants again moved for dismissal on March 22, 2013. (ECF No. 17.) Plaintiff timely opposed. (ECF No. 18.) That Motion is now before the Court for decision.

### III. LEGAL STANDARD

Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short

---

[3] Central Coast includes two paragraphs numbered "11" in its First Amended Complaint. For clarity, the Court will refer to the second paragraph 11 as "¶ 11-2."

and plain statement—to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003); Fed. R. Civ. P. 8(a)(2). For a complaint to sufficiently state a claim, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While specific facts are not necessary so long as the complaint gives the defendant fair notice of the claim and the grounds upon which the claim rests, a complaint must nevertheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Iqbal*'s plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but does not go so far as to impose a "probability requirement." *Id.* Rule 8 demands more than a complaint that is merely consistent with a defendant's liability—labels and conclusions, or formulaic recitals of the elements of a cause of action do not suffice. *Id.* Instead, the complaint must allege sufficient underlying facts to provide fair notice and enable the defendant to defend itself effectively. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

When considering a Rule 12(b)(6) motion, a court is generally limited to the pleadings and must construe "[a]ll factual allegations set forth in the complaint . . . as true and . . . in the light most favorable to [the plaintiff]." *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). Conclusory allegations, unwarranted deductions of fact, and unreasonable inferences need not be blindly accepted as true by the court. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Yet a complaint should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts" supporting plaintiff's claim for relief. *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). But leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986); *see Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## IV. DISCUSSION

In its First Amended Complaint, Central Coast alleges that the Pipe Shield Defendants breached the noninterference provision of the Settlement Agreement by conspiring with and persuading Elastochem not to sell the AG 310 epoxy to Central Coast. Plaintiff contends that Elastochem offered the epoxy for sale to the general public on the Internet, so Elastochem's refusal to sell the epoxy to Central Coast constitutes an anticompetitive and unfair business practice.

Defendants disagree, arguing that the Settlement Agreement imposed no affirmative obligations on them to provide Central Coast with epoxy. They also contend that if any party breached the agreement it was Central Coast, as Plaintiff attempted to circumvent BMS's exclusive-epoxy-distribution right in California by attempting to purchase AG 310 directly from Elastochem, the manufacturer. The Court considers the pleading adequacy of each claim in turn.

**A. Breach of contract**

Under California law, the essential elements of a breach-of-contract claim are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968) (in bank).

Central Coast alleges that Defendants breached the Settlement Agreement's noninterference clause by conspiring to deprive Central Coast of the ability to purchase AG 310, which is allegedly the same product as the epoxy Plaintiff formerly purchased from Pipe Shield USA. Central Coast contends that Defendants understood

how vital this epoxy was to Plaintiff's business, yet BMS allegedly told Elastochem not to sell to Central Coast. Plaintiff also asserts that it performed all of its obligations under the contract and that there were no valid reasons for Defendants not to perform.

Defendants disagree, arguing that Central Coast's breach-of-contract claim doesn't hold water. They contend that the agreement imposed no affirmative obligations on them to provide Central Coast with any epoxy; indeed, the whole point of the agreement was to sever ties between Central Coast and the Pipe Shield Defendants. Defendants further assert that Central Coast is the breaching party because it sidestepped BMS by trying to purchase epoxy directly from Elastochem.

While Central Coast's breach allegations are tenuous, the Court must accept them at this stage as true. Essentially the case comes down to the noninterference provision's interpretation, that is, what the parties meant when they agreed that each party would "refrain from interfering with, hindering or by any means impeding the business operations and/or expansion of any other Party." Certainly if Central Coast could not obtain any epoxy, it could not grow as a business—thus suffering lost-sales damages. Though Elastochem was not a party to the agreement, if the Pipe Shield Defendants persuaded Elastochem not to sell to Central Coast, that conspiracy could rise to the level of interference—and thus breach.

The Court therefore finds that Central Coast sufficiently stated a breach-of-contract claim and **DENIES** Defendant's Motion on this ground.

**B. Fraud**

The Federal Rules of Civil Procedure establish a higher water mark for pleading fraud. Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." When a plaintiff alleges fraud by multiple defendants, the plaintiff may not merely lump the defendants together; Rule 9(b) requires plaintiffs to "inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007).

Central Coast alleges that when the Pipe Shield Defendants entered into the Settlement Agreement they did not really intend to perform their promises not to hinder Plaintiff's business. Central Coast contends that there is a "strong inference" of fraud because Defendants allegedly conspired to thwart Plaintiff's epoxy supply within one year of executing the agreement.

Defendants respond that Central Coast's fraud allegations are "patently conclusory" and that Plaintiff fails to differentiate between the different Defendants and their respective participation in the alleged fraud.

The Court agrees. Central Coast had three chances between its original Complaint, First Amended Complaint, and Opposition to meet its heightened pleading burden under Rule 9(b). Yet Plaintiff sticks to its watery group-fraud allegations, conclusorily comingling all Defendants together. And Central Coast's "strong inference" is really nothing more than fallacious *post hoc* reasoning—that Defendants must not have intended to perform their promises simply because Plaintiff alleges some breach occurred after the parties signed the agreement. Defendants are not apprised of specifically how they allegedly defrauded Central Coast. Rather, Plaintiff's claim sounds more in contract than it does in tort.

The Court therefore **GRANTS** Defendants' Motion with respect to Central Coast's fraud claim.

## C. Intentional-interference claims

California law prohibits third parties from intentionally interfering with any contract. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). The elements of an intentional-interference claim are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Id.*

/ / /

The elements for intentional interference with prospective economic advantage are essentially the same, just substituting an economic relationship with a contract. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521–22 (1996). But in the latter type of claim, the interference must be "independently wrongful," that is, it must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008).

Central Coast alleges that it "had contracts and/or business relationships and/or prospective business advantage and relationship with various customers . . . many of which customers were known to the plaintiff." (FAC ¶ 22.) Plaintiff broadly identifies its class of customers as those which would not otherwise purchase AG 310 from Elastochem on the Internet.

Defendants contend that if Central Coast did not know all its customers, then there is no way Defendants knew them either. And since knowledge is an essential element of interference claims, Central Coast's third claim fails.

Defendants' point is well taken. In its third claim, Central Coast simply alleges elements without plausibly demonstrating how its allegations fit the interference claims. It is also rather odd—and fatal to Central Coast's claim—that Plaintiff does not allege one single specific contract or business relationship Central Coast either had or that was interrupted by the Defendants' alleged actions. *See Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1188 (C.D. Cal. 2011) (requiring the terms of the contracts in question to be set out in the complaint).

The Court accordingly **GRANTS** Defendants' Motion on the third claim.

**D.    Cartwright Act**

To allege a Cartwright Act violation, a plaintiff must establish "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 373 (2001). But as the United States Supreme Court

noted, a manufacturer "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (interpreting the Sherman Act); *see also Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976) ("[F]ederal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.").

Central Coast contends that Defendants' alleged conduct constituted a "scheme or design" to restrain trade. Despite Elastochem's alleged representation that it would sell epoxy to anyone, Elastochem refused to sell to Central Coast, a member of the general public. Defendants allegedly recognized that Central Coast was a substantial enough competitor that it posed a major threat to the Pipe Shield Defendants, so they conspired to "destroy plaintiff's ability to obtain product," thereby injuring Central Coast's business.

Defendants disagree, arguing that Elastochem simply informed Central Coast that any epoxy sales had to go through BMS, the exclusive California distributor. Additionally, Elastochem did not completely refuse to sell epoxy to Central Coast, as Elastochem offered to sell Plaintiff epoxy for its personal use.

Elastochem could refuse to sell epoxy to anyone it wanted without violating antitrust laws, especially considering that Elastochem is a manufacturer and not a distributor. Any refusal by Defendants to sell Plaintiff epoxy was not an anticompetitive trust but rather the simple reality of the parties' severed business relationship. Further undergirding this conclusion is the fact that Elastochem offered to sell Central Coast whatever epoxy it needed for its personal use—hardly the mark of a conspiratorial trust.

Since Central Coast has not stated a Cartwright Act claim, the Court **GRANTS** Defendants' Motion on that ground.

### E. Conspiracy and aiding and abetting

Central Coast asserts that Defendants conspired with and aided and abetted each other to carry out "fraudulent, illegal, oppressive and tortious conduct, acts, practices

1 and schemes." Central Coast argues that a conspiracy can be inferred from all of its
2 other allegations in the First Amended Complaint.

3 But Defendants correctly point out that Central Coast's sixth claim states only
4 bare conclusions devoid of any factual support. Central Coast does not include one
5 single fact in its conspiracy claim to demonstrate how Defendants allegedly conspired
6 with and aided and abetted each other in carrying out any illegal activities. Since
7 Defendants are simply left to guess at what Central Coast means by its leaky
8 allegations, the Court **GRANTS** Defendants' Motion on Central Coast's sixth claim.

### F. Negligence

In its last claim, Central Coast tersely alleges that the "actions of the defendants were done negligently." As Defendants argue, Central Coast does not allege any legal duty of care owed by Defendants to Central Coast or how they allegedly breached that duty. And again, Central Coast weaves no facts into its threadbare allegations, leaving but a thin veil over what really is a breach-of-contract claim dressed in different clothing. The Court thus **GRANTS** Defendants' Motion on this claim.

### G. Unfair Competition Law

A breach-of-contract claim can form the basis of an unfair-competition law claim—but only if the plaintiff alleges conduct that is unlawful, unfair, or fraudulent. *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (2008). Conduct is "unfair" when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

As discussed above, the Court finds that Central Coast failed to state any claim other than a breach-of-contract claim. Although Central Coast alleges some facts showing questionable behavior, those facts do not suffice to support a claim under California's unfair-competition law. Without pleading additional facts, the allegations

in the First Amended Complaint demonstrate nothing more than the harsh reality of competition. The Court thus **GRANTS** Defendants' Motion on this claim.

## V.   CONCLUSION

In summary, Defendants' Motion is **DENIED** with respect to Central Coast's first claim and **GRANTED** as to Plaintiff's second through seventh claims. Since Central Coast had several attempts to strengthen its allegations but continually failed, the second through seventh claims are **DISMISSED WITH PREJUDICE**. Defendants shall file an answer within 14 days of this order.

**IT IS SO ORDERED.**

April 19, 2013

_____

**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**