O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL COAST PIPE LINING, INC., | Case No. 2:13-cv-00639-ODW(Ex) |
| Plaintiff, | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT [35]** |
| v. | |
| PIPE SHIELD USA, INC.; PIPE SHIELD SERVICES, LTD.; B.G. ARNOLD SERVICES T/A BRADLEY MECHANICAL SERVICES; ELASTOCHEM COMPANY SPECIALTY, INC.; DOES 1–100, inclusive, | |
| Defendants. | |

## I.   INTRODUCTION

After a falling out between Plaintiff Central Coast Pipe Lining, Inc. and Defendant B.G. Arnold Services T/A Bradley Mechanical Services ("BMS"), the parties executed a Settlement Agreement. Paragraph 4 of that agreement states that the "Parties agree that each will for itself and/or directly or indirectly through any other party, refrain from interfering with, hindering or by any means impeding the business operations and/or expansion of any other party." Central Coast attempted to purchase pipelining epoxy directly from former defendant Elastochem Company Specialty, Inc.—manufacturer of the epoxy BMS formerly sold to Central Coast.  But BMS blocked the sale, Elastochem was unwilling to sell to Central Coast, or both.

Central Coast then sued for breach of the Settlement Agreement. Since both parties offer conflicting evidence bearing upon the Settlement Agreement's ultimate interpretation, the Court finds that there are genuine issues of material fact and accordingly **DENIES** BMS's Motion for Summary Judgment.[1] (ECF No. 35.)

## II. FACTUAL BACKGROUND

Central Coast is a California corporation that is engaged in the business of rehabilitating potable water pipes via blow-through epoxy lining. BMS is a Canadian corporation that sells pipelining epoxies. Elastochem[2] manufactures and supplies BMS with the epoxies at issue in this case.

On December 31, 2010, Central Coast and BMS entered into a License Agreement under which Central Coast received the exclusive right to use and sublicense BMS's pipelining epoxy in California. (Statement of Undisputed Facts ("SUF") 11.) Central Coast paid BMS $100,000 for the license. (SUF 12.)

BMS and Elastochem are co-owners of Elastochem's pipelining epoxy products with BMS acting as Elastochem's exclusive distributor. (SUF 10.) As a result of this agreement, BMS argues that Elastochem cannot sell pipelining epoxy directly to an end user. (SUF 16, 25–26.)

One of Elastochem's products is AN500 pipelining epoxy—the epoxy Central Coast formerly used in its business. (SUF 19.) After BMS and Elastochem entered into their Co-Ownership Agreement, BMS and Elastochem developed another epoxy: AG310. (SUF 18.) Elastochem has never sold AG310. (SUF 28.) Central Coast asserts that Elastochem is free to sell AG310 to whomever it wants because the Co-Ownership Agreement does not mention AG310. (SUF 16, 25–26.)

While Elastochem developed AN500 for lining pipes, BMS contends that AG310 is not suitable for pipelining, because it is less viscous than AN500. (SUF 19–

---

[1] After carefully considering the papers filed with respect to this Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

[2] On April 19, 2013, the Court granted in part Defendants' Motion to Dismiss, thereby eliminating all claims against Elastochem. (ECF No. 22.)

22, 24.) BMS argues that AG310's intended use is for lining municipal water cisterns, water reservoirs, and metal and concrete tanks—not pipes. (SUF 23.) Central Coast disagrees, asserting that AG310 is not chemically or physically different than AN500. (SUF 19–24.) At the time the parties entered into the Settlement Agreement, Stan Rutiz, Central Coast's President, believed that AN500 and AG310 were identical products. (SUF 31.)

In September 2011, Rutiz submitted two pseudononymous price requests directly to Elastochem regarding AG310. (Arnold Dep. Ex. 10.) Rutiz did not disclose that he wished to use AG310 for pipelining. (SUF 54.) Brenda DiLoreto, the wife of Elastochem's Technical Director, Sam DiLoreto, quoted $135 a gallon and provided AG310's material safety data sheet. (Arnold Dep. Ex. 10.)

Central Coast and BMS had a falling out and began negotiating a settlement agreement in December 2011. Rutiz proposed that after the parties finalized the settlement, Central Coast would be free to purchase epoxy from any source, including Elastochem, and that BMS would not interfere with Central Coast's purchases. (SUF 38.) Brad Arnold, BMS's President, replied that this was "not an option [BMS was] willing to entertain." (*Id.*)

On December 7, 2011, Rutiz emailed Arnold, telling him, "You know I have no other means to purchase NSF-61 potable epoxy, which I need to go forward. You will advise Elastochemical [*sic*] in writing, you have no objection to them selling me their epoxy, as they would to you or any other purchaser." (Rutiz Dep. Ex. 9.) Arnold responded, informing Rutiz that after the settlement, "any epoxy sales will be through Pipe Shield[3] not directly with my supplier [Elastochem]." (*Id.*)

That same day, Rutiz expressed his understanding, stating that he was "free to conduct [his] business in any manner, in any area, however and where [he] please[d]"—besides purchasing AN500 only from BMS/Pipe Shield. (*Id.*) But

---

[3] It appears that Pipe Shield USA was wound up, and BMS succeeded to Pipe Shield's contract interests with Central Coast. (*See* Mot. 2.)

Arnold cautioned that the "only issue is that once [Central Coast's] territory is sold, the epoxy [Central Coast] will purchase will be for [its] own use only, not for resale." (*Id.*)

Central Coast's first proposed version of the Settlement Agreement included a noninterference provision, which read,

> The Pipe Shield Parties hereby agree for each of them that they will use best efforts to facilitate the sale of any epoxy from any source to CCPL and or its designees and shall each whether for itself and/or directly or indirectly through any other party, refrain from interfering with, hindering or by any means impeding such sale.

(Arnold Dep. Ex. 10.)

On January 18, 2012, the parties finalized their Settlement Agreement. (SUF 13.) BMS agreed to return $70,000 to Central Coast and to sell Central Coast pipelining epoxy at $175 a gallon until the $70,000 was fully repaid. (SUF 14.) In return, Central Coast gave up its exclusive California rights to BMS's epoxy under the Master License. (SUF 15.)

The final version of the noninterference provision, or paragraph 4 of the Settlement Agreement, states,

> The Parties agree that each will for itself and/or directly or indirectly through any other party, refrain from interfering with, hindering or by any means impeding the business operations and/or expansion of any other party. For greater clarity, the Parties will be permitted to compete with any other Party in a commercially reasonable manner.

(SUF 9.)

In discussing the noninterference provision, Arnold contends that he made it clear to Rutiz that Rutiz could not buy any epoxy directly through Elastochem. (Arnold Dep. 200:12–201:1.) But Central Coast's understanding of the provision was that Central Coast and BMS were each free to do whatever they wanted with their

1  own businesses. (Rutiz Dep. 146:2–4.)  Rutiz avers that he and Arnold discussed that
2  Central Coast "could buy epoxy from any source, any time, anywhere," including
3  from Elastochem. (*Id.* 146:19–22.)

4  On February 13, 2012, Rutiz contacted Ms. Loreto, inquiring about purchasing
5  AG310, which he believed was identical to AN500. (Arnold Dep. Ex. 10.)
6  Mr. DiLoreto forwarded the email to Arnold, asking how Arnold wanted Elastochem
7  to handle Rutiz's request. (*Id.*)  On Februrary 15, 2012, Arnold replied, "He [Rutiz] is
8  a snake. . . . I would appreciate it if you would tell him that he will have to order
9  through me [BMS].  Is the AG 310 the same as AN 500?" (*Id.* (ellipsis in original).)
10 Mr. DiLoreto responded that he "had no intention of selling [Rutiz] anything! . . . The
11 AG310 is not the same." (*Id.*)

12 BMS asserts that it will sell Central Coast AN500 for its own use but not for
13 resale. (Arnold Dep. 131:6–15.)  Central Coast admits that there are four other
14 companies from which it could obtain its pipelining epoxy. (SUF 72.)  But Central
15 Coast would have to become a licensee or franchisee of one of these companies,
16 which it does not want to do. (SUF 82.)

17 On December 17, 2012, Central Coast filed suit in San Luis Obispo County
18 Superior Court against Defendants Pipe Shield USA, Inc., Pipe Shield Services, Ltd.,
19 BMS, and Elastochem. (Not. of Removal Ex. A.)  Central Coast alleged claims for
20 breach of contract; fraud; intentional interference with contract; Cartwright Act
21 violations; violation of California's Unfair Competition Law; conspiracy and aiding
22 and abetting; and negligence.

23 After two rounds of motions to dismiss, the Court narrowed the issues down to
24 just the breach-of-contract claim.  The Court's previous Orders also eliminated any
25 claims against Elastochem.  On November 15, 2013, BMS moved for summary
26 judgment. (ECF No. 35.)  Central Coast timely opposed. (ECF No. 36.)  That Motion
27 is now before the Court for decision.
28 / / /

## III.  LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial.  *Id.*; Fed. R. Civ. P. 56(c).  Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

A genuine issue of material fact must be more than a scintilla of evidence or evidence that is merely colorable or not significantly probative.  *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## IV.  DISCUSSION

BMS moves for summary judgment on Central Coast's sole remaining claim for breach of contract.  BMS contends that the undisputed evidence demonstrates that paragraph 4 of the Settlement Agreement means that Central Coast could purchase pipelining epoxy directly from any source other than Elastochem.  But Central Coast denies that it ever discussed Elastochem and ardently asserts that the noninterference provision means that it can purchase epoxy from any company—including Elastochem.  Given the disagreement over whether the parties ever discussed

Elastochem and to what extent, the Court finds that there is a genuine dispute of material fact sufficient to preclude summary judgment.

**A.     Interpretation of the Settlement Agreement**

BMS argues that the agreed interpretation of paragraph 4 is that Central Coast could purchase pipelining epoxy from any source other than its supplier, Elastochem. Central Coast disagrees, asserting that the parties agreed that it could purchase epoxy from Elastochem or any other source.

*1.     Parol-evidence rule*

California law provides that a court should interpret a contract solely by its language if the language is "clear and explicit." Cal. Civ. Code § 1638. In interpreting a contract, "the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (Ct. App. 2008); *see also* Civ. Code § 1639 (noting that the parties' intention should be ascertained by the writing alone, where possible).

When, as here, the parties resort to prior discussions to interpret a contract's terms, the parol-evidence rule governs the admissibility of the pre-incorporation evidence. The parol-evidence rule provides that terms "set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Civ. Proc. Code § 1856(a); *Wolf*, 162 Cal. App. 4th at 1126 (holding that extrinsic evidence is generally inadmissible).

But a court may employ extrinsic evidence to explain a contract, unless the writing is fully integrated. Civ. Proc. Code § 1856(b). The court therefore must preliminarily determine whether the parties intended the contract to be a final expression of their agreement. *Id.* § 1856(d). An integration or merger clause is persuasive evidence of full integration. *Founding Members of the Newport Beach*
/ / /

*Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 953–54 (Ct. App. 2003).

Here, the Settlement Agreement does include a merger clause, which states that the "Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein." The clause also states that the "Agreement supersedes all prior and contemporaneous representations and understandings of the Parties." But since the parties only wish to explain the noninterference provision's terms, the Court finds that the integration clause does not bar the party's prior negotiations solely for interpretative purposes. *See* Civ. Code § 1856(g).

*2. Explaining paragraph 4's meaning*

In ruling on Defendants' second Motion to Dismiss, the Court framed the heart of the breach-of-contract issue: "Essentially the case comes down to the noninterference provision's interpretation, that is, what the parties meant when they agreed that each party would 'refrain from interfering with, hindering or by any means impeding the business operations and/or expansion of any other Party.'" (ECF No. 22, at 6.) Paragraph 4 of the Settlement Agreement does not specifically reference whether Central Coast could purchase from Elastochem, BMS's supplier, or whether BMS had any duty to not interfere with Central Coast's attempt to purchase directly from Elastochem. Both parties offer conflicting interpretations of the settlement provision.

When interpreting a contract's terms, California courts employ a three-step process. First, the court must determine whether the terms are reasonably susceptible to the interpretation advanced by the proffered extrinsic evidence. *Wolf*, 162 Cal. App. 4th at 1126–27. If the language is reasonably susceptible to the proposed meaning, the court admits the extrinsic evidence. *Id.* If there is no material conflict between the extrinsic evidence adduced, the court interprets the contract solely as a matter of law. *Id.* But when "there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury." *Id.*

BMS argues that both parties understood the noninterference provision to mean that Central Coast was free to purchase pipelining epoxy from any source other than Elastochem. Arnold contends that he made it clear to Rutiz that Central Coast could only purchase epoxy through BMS and not directly from Elastochem due to BMS owning the exclusive distribution rights to Elastochem's pipelining products. BMS also points out that Rutiz agreed via email that he would not purchase AN500 from any source other than Pipe Shield/BMS.

Central Coast disagrees, arguing that the parties agreed through paragraph 4 that Central Coast is free to purchase pipelining epoxy from any source—including directly from Elastochem. Central Coast indicates that it incorporated this understanding in its first version of paragraph 4, and the final version—though worded differently—only includes "insignificant changes." Rutiz also asserts that the parties specifically discussed Central Coast being able to purchase pipelining epoxy from Elastochem.

While the parties offer divergent interpretations of the noninterference provision, that disagreement will not alone preclude summary judgment. *Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc.*, 176 Cal. App. 3d 886, 892 (Ct. App. 1986) (noting the difference between disputed inferences as opposed to conflicting evidence).

But the parties here also offer conflicting evidence. BMS contends that the parties agreed that Central Coast could not purchase pipelining epoxy directly from Elastochem. (Arnold Dep. 198:22–201:1.) In stark contrast, Central Coast—through Rutiz—asserts that the parties specifically discussed and established that Central Coast could purchase epoxy from anyone—including Elastochem. (Rutiz Dep. 145:25–146:22.) What the parties discussed with respect to Central Coast's ability to purchase directly from Elastochem bears upon the ultimate interpretation of the ambiguously worded noninterference provision. That is, one cannot determine the parties' objective intent in agreeing to "refrain from interfering with, hindering or by

1  any means impeding the business operations and/or expansion of any other party"
2  until a trier of fact resolves what the parties actually discussed regarding Elastochem.
3  *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 914 (Ct. App. 1998) (holding that the
4  jury had to determine which conflicting evidence to believe before the court could
5  interpret a disputed contract provision).

6  BMS argues that the parties' undisputed December 7–8, 2011 email exchange
7  demonstrates that Central Coast agreed that it could only purchase epoxy from Pipe
8  Shield/BMS. But Central Coast merely stated that it would only purchase "AN500"
9  from BMS. There is no reference to AG 310—and thus that discussion does not
10 resolve the evidentiary dispute.

11 The parties also hotly dispute much about AG310, including whether
12 Elastochem could legally sell it to Central Coast without violating the BMS-
13 Elastochem Co-Ownership Agreement, whether Elastochem was willing to sell
14 AG310 to Central Coast, and whether AG310 and AN500 are chemically and
15 physically similar enough that one could use AG310 for pipelining. But neither party
16 submitted any expert testimony determining whether both products are similar enough
17 that one could use AG310 in lieu of AN500. And even if Arnold, the DiLorettos,[4] or
18 Rutiz could be considered experts for this limited purpose, both parties still offer
19 contradictory evidence regarding the similarity of the products. The Court
20 consequently finds that there is a genuine issue of material fact on the chemical and
21 physical similarity between AN500 and AG310—i.e., whether Central Coast could
22 even have used AG310 for pipelining.

23 With these genuine disputes of material fact, the Court cannot at this stage
24 interpret the parties' noninterference provision. The Court accordingly **DENIES**
25 BMS's Motion on this ground.
26 / / /

---

[4] BMS objects to the admission of Brenda DiLoretto's deposition testimony regarding the identity of the epoxies on the basis of lack of foundation and relevance. Since Central Coast's cited testimony does not support its proposition, the Court **SUSTAINS** BMS's objection.

### B. Breach

Under California law, the essential elements of a breach-of-contract claim are (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968) (in bank).

Central Coast argues that BMS breached the Settlement Agreement by requesting that Elastochem not sell AG310 to Central Coast. Perplexingly, one way Central Coast contends that BMS breached the agreement was by instructing Elastochem not to sell epoxy to Central Coast on December 7, 2011. Considering that the parties executed the Settlement Agreement on January 18, 2012, BMS could not have prospectively breached an agreement a month before it ever existed.

In any event, one cannot determine whether BMS breached the agreement before one determines the full scope of BMS's contractual duties. Since there are genuine issues of material fact bearing upon interpretation, the Court cannot assess at this point whether Central Coast proved the breach element of its claim.

### C. Causation

BMS next argues that Central Coast cannot prove causation, because Elastochem was contractually bound to refrain from selling pipelining epoxy to end users like Central Coast. Central Coast disagrees, contending that Elastochem previously offered to sell Central Coast AG310—all without BMS's prior approval. Central Coast also asserts that BMS did not have the legal right to exclusively sell AG310, because BMS did not pay for the development of the product and it was not listed in the BMS-Elastochem exclusivity agreement.

In breach-of-contract cases, the test for causation is "whether the breach was a substantial factor in causing the damages." *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (Ct. App. 2005).

As discussed above, the Court cannot resolve what role AG310 plays in BMS's alleged breach of contract without a trier of fact first determining whether AG310 is a

viable substitute for AN500. The parties fervidly dispute the identity of the products and provide contradictory opinions on the issue. It is therefore premature to opine whether Central Coast can prove causation due to BMS and Elastochem's exclusivity agreement or whether the Co-Ownership Agreement covered AG310.

### D. Failure to mitigate damages

BMS's final argument centers on Central Coast allegedly failing to mitigate damages. California law is clear that a "plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (Ct. App. 1993).

BMS argues that Central Coast can obtain pipelining epoxy from other companies, such as Duraflow, Nuflow, and American Pipe Lining. BMS further points out that Central Coast has not sought epoxy from these other sources. Lastly, BMS contends that nothing precludes Central Coast from purchasing AN500 from BMS for Central Coast's business use—just not for resale. But Central Coast asserts that these other companies do not sell directly to end users, and Central Coast is not willing to become a franchisee or licensee of one of these companies.

BMS seems to argue that the Court should preclude Central Coast from recovering any damages for failing to mitigate. But this is "an incorrect interpretation of the law. A party's failure to take reasonable steps to mitigate damages bars recovery of only the avoidable portion of the damages"—not all damages. *Carnation Co. v. Olivet Egg Ranch*, 189 Cal. App. 3d 809, 819 n.12 (Ct. App. 1986). Even if the Court were to determine that Central Coast could have obtained pipelining epoxy elsewhere, there is no evidence before the Court of the exact dollar amount Central Coast could have saved. Rather, the factual disputes regarding the availability of replacement epoxy and the failure-to-mitigate calculation remain for the trier of fact to resolve.

/ / /

## V.   CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' Motion for Summary Judgment.  (ECF No. 35.)

**IT IS SO ORDERED.**

December 9, 2013

_____
         **OTIS D. WRIGHT, II**
    **UNITED STATES DISTRICT JUDGE**